

**SO ORDERED,**

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

In re:                                        )
                                              )
ZACHARY ALAN BURK,                            )        Case No.:   15-14529-JDW
                                              )
            Debtor.                           )        Chapter:    7
                                              )

MID-SOUTH MAINTENANCE,                        )
INC., et al.,                                 )
                                              )
            Plaintiffs,                       )
                                              )
v.                                            )        A.P. No.:   16-01063-JDW
                                              )
ZACHARY ALAN BURK,                            )
                                              )
            Defendant.                        )
                                              )

In re:                                        )
                                              )
STEPHEN PAUL SMITH and                        )        Case No.: 15-14530-JDW
JESSICA NICHOLE SMITH,                        )
                                              )
            Debtors.                          )        Chapter 7

| | | |
|---|---|---|
| MID-SOUTH MAINTENANCE, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | A.P.: No.: 16-01064-JDW |
| STEPHEN PAUL SMITH and JESSICA NICHOLE SMITH, | ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION[1]</u>

These adversary proceedings are before the Court on the *Adversary Complaint* (the "Complaint") (A.P. Dkt. #1 in each case) to determine dischargeability filed by the creditor-plaintiffs Mid-South Maintenance, Inc.; Mid-South Maintenance, Inc., Memphis; and Worldwide Steel Works, Inc., (collectively, "Mid-South") against the debtor-defendants Zachary Alan Burk (A.P. No. 16-1063) and Jessica Nichole Smith and Stephen Paul Smith (A.P. No. 16-1064) (collectively, the "Defendants").

This trial encompassed three related adversary proceedings[2] centered around the undisputed embezzlement of Mid-South's funds by non-defendant

---

[1] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] A Memorandum Opinion and a Final Judgment were entered in *Mid-South Maintenance, Inc. v. Jones*, A.P. 16-01062, at Dkt. # 56 and 57 in that adversary proceeding.

Kimberly Cray Burk, the mother or mother-in-law of each of these Defendants. Her scheme involved falsifying the employment of the Defendants, and others, as employees of Mid-South and depositing paychecks into their bank accounts. The three adversary proceedings share common issues of fact and law. Many of the witnesses testified to facts material in all three proceedings, and the arguments were virtually identical. For these reasons, the adversary proceedings were tried together, although each remains distinct.

The defendants in each adversary proceeding told basically the same story: although tens of thousands of embezzled dollars went through their accounts, none of the defendants had any knowledge that they were spending embezzled funds because they never looked at their bank statements, which went to Kimberly. All of the defendants claim that Kimberly perpetrated this embezzlement without their knowledge, even though the defendants, not Kimberly, spent the majority of the money, which greatly exceeded their own personal incomes. In determining the facts that follow, the Court's in-person observation of each witness was an important factor in determining credibility.

Having heard extensive testimony over a period of three days and examining the documents admitted into evidence, this Court concludes that a judgment of nondischargeability is due to be entered in favor of Mid-South against debtor-defendants Jessica Nichole Smith and Stephen Paul Smith, but that Mid-South has failed to carry its burden as to Zachary Burk.

## I.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334, and the *United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 6, 1984. This is a core proceeding as set forth in 28 U.S.C. § 157(b)(2)(B) and (I). The parties have consented to this Court's jurisdiction. (A.P. Dkt. # 39, ¶ 6 in each).

## II.    FINDINGS OF FACT[3]

### A. Common Facts

Kimberly Burk, who is not a defendant here, is a persistent criminal. She is currently serving her third prison term for embezzlement. In 1990, she pleaded guilty to bank fraud after stealing approximately $50,000 from an employer. In 2011, she pleaded guilty to embezzling $40,000 from another employer, Nu-Corp. She has most recently pleaded guilty to embezzling at least $1.4 million from Mid-South, and is currently in prison for that crime. This third embezzlement forms the foundation of this adversary proceeding.

Kimberly began working for Mid-South in 2005, eventually becoming the office manager. Through this position, she deposited unearned payroll checks

---

[3] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

into various accounts of family members by direct deposit. In order to hide her scheme, Kimberly received all of the bank statements for Mid-South. She then gave falsified summaries to Mid-South's owner, CPA, and auditors. When other employees raised questions, Kimberly would fire them. Mid-South's annual audit and outside CPA firm did not uncover Kimberly's scheme. In fact, the Mid-South embezzlement was discovered only after Kimberly went to prison for embezzling from Nu-Corp.

During the relevant time period, Mid-South's annual income averaged $15,000,000. The $300,000 a year that Kimberly stole was material, but not so crippling to the company that theft was suspected. Dennis Jones, owner of Mid-South, assumed the company's construction projects were not doing well and that was the reason for the decreased profits. This assumption was supported by the project summaries Kimberly gave him. Dennis credibly testified that he was so focused on the construction side of his business that he never considered that the issue was coming from the office.

Late in her term with Mid-South, Kimberly was arrested for embezzling $40,000 from Nu-Corp. Despite the charges, Dennis allowed Kimberly to continue working at Mid-South in the same capacity, because Kimberly convinced him of her innocence. She told him that the charges were related to stock certificates and expense checks cashed by others. The defendants argued that this arrest should have put Dennis on notice of Kimberly's activities, but

Dennis credibly testified that he believed Kimberly. All witnesses (plaintiff and defense) testified that Kimberly was very convincing and deceived everyone. All witnesses also testified that Kimberly worked hard and was competent in her job.

Allusions were made by the defendants to a romantic relationship between Kimberly and Dennis, which could have clouded his judgment in continuing to rely on her, but there was no evidence to support this. All witnesses in close proximity credibly denied any improper relationship, including Kimberly and Dennis.

After depositing embezzled funds into her children's accounts, Kimberly would frequently tell her children that her paycheck was deposited in their account by mistake and would instruct them to withdraw a portion of the cash and give it to her. The Court is satisfied with the testimony that when this happened, Kimberly did receive and spend the funds, as detailed below. However, the withdrawals only constituted a small portion of the funds funneled into her children's accounts. The Defendants themselves spent the majority of the funds.

## B. Zachary Burk

Zachary is the son of Kimberly Burk. At the time of the embezzlement, he was 18 years old and a freshman in college. He attended three different colleges over a period of a year and a half and was on the baseball team for two

of those schools.  Everything Zachary had ever received was from his mother.

He lived on cash from Kimberly or money that she deposited into his account.

He had never held a real job.[4]  He just went to school and played baseball.

When Zachary dropped out of college, he started managing his own affairs.  He

then opened his own bank account and the deposits from Kimberly stopped.

The bank account Kimberly used to give Zachary embezzled funds was

opened, by Kimberly, while Zachary was in high school.  It was never really

Zachary's account.  Every deposit was made by Kimberly.  She made deposits,

managed funds, and made payments from this account.  Zachary did not check

balances, work within a budget, or exercise any type of financial management.

Kimberly received the bank statements, and Zachary never saw them.  He

credibly testified that he never looked at his bank account, spent whatever he

wanted, and his mother would manage his balance.

Zachary credibly testified that he did not question the source of funds in

his account.  All of the money that he had ever received at that time came from

his mother.   He simply thought of her as the source of all his money.

Additionally, Kimberly was working many hours and so, in Zachary's mind,

there was no reason to question the legitimacy of the funds.  As far as Zachary

---

[4] Zachary worked for Mid-South for a few days, but was in no way a regular employee nor did
he develop an understanding of the working world through his short time there.

knew, his mother worked many hours and was making enough for him to be able to spend what he wanted.

Kimberly would frequently tell Zachary that her check had been deposited into his account and would instruct him to make a cash withdrawal and give the money to her. Zachary did so, and this never made him suspicious, because he viewed the money in his account as Kimberly's anyway.

Despite Zachary's belief at the time of the embezzlement, a great deal of money flowed through his account, in excess of $100,000. This vast sum would put a responsible adult on notice that the funds being spent were not coming from his mother's legitimate pay. But Zachary was not a responsible adult at the time. Kimberly testified that Zachary thought there was an endless amount of money and that she never told him "no" throughout his life. He was young, naive, irresponsible, and a self-described "spoiled brat." He is not unintelligent, but at that point he had never been in a position to handle finances. He had never held a real job to know what people reasonably earn. He had no formal or informal training in finance or accounting. Zachary had no understanding of what earning or spending was reasonable at that stage of his life.

Zachary does not contest that he spent the money in his account and now understands that a portion of these funds were from Mid-South. He now sees

8

exactly what his mother did, but it is clear to the Court that at the time, he did not know she was embezzling money.

At that stage in his life, Zachary had never had a job and did whatever his mother told him to do.  While his spending was irresponsible, he had no knowledge that the funds in his account were stolen.  His testimony was credible and the Court finds that he had no knowledge of the source of the funds or his mother's scheme.

C. <u>Stephen and Jessica Smith</u>

1. <u>Stephen Smith</u>

Stephen Smith is married to Kimberly's daughter, Jessica Smith. Stephen and Jessica were also young when the embezzlement scheme took place, but their situation was different.  Stephen, while young, was an independent adult at the time of the embezzlement.  He left his parents' home and was on his own at the age of 17.  He worked and understood how much people reasonably earn.  Stephen knew that income comes from paychecks and that one must pay expenses accordingly.  Stephen was self-reliant and knew he could only spend what he earned.

Kimberly also helped Stephen open a bank account when he was 18. Like the other defendants, Stephen testified that he never looked at bank statements, never checked his balance, and never accessed his account online.

Stephen was aware of Kimberly's history of embezzlement. He was dating Jessica when Kimberly was arrested in 2009 and knew that the arrest was for stealing money from Nu-Corp.

Kimberly also frequently told Stephen that her paychecks were deposited into his account and would ask him to withdraw cash and give it to her. That happened but, Kimberly did not withdraw all of the Mid-South money that was deposited into his account and Stephen knew this. Being familiar with how paychecks work, Stephen knew that he was receiving much more than he should have. At times, he spent two to four times what he was earning. When questioned as to why he could keep large portions of what he was being told was Kimberly's paycheck, Stephen testified that "she's just nice."

The frequency of Kimberly's "paychecks" being deposited into Stephen's account caused him to be suspicious. Stephen testified that he frequently questioned Kimberly about why her paychecks were deposited into his account. Kimberly became angry and told him it was an office error and not to worry about it or question her. Stephen did not inquire any further and continued to spend far more than he was making. Stephen knew something was not right, but he was receiving a large amount of money and was being allowed to spend in excess. The Court did not find Stephen's testimony credible that he was

unaware that he was spending embezzled funds. He was willing to accept Kimberly's explanations because he was profiting from the deposits.

Embezzled funds totaling $99,545.80 flowed through Stephen's account.[5] Based on Stephen's testimony that Kimberly told him that her paychecks were mistakenly deposited into his account (many times), that she made him withdraw the "mistaken deposits" as cash, and the Court's satisfaction that this money went to Kimberly, the Court has deducted from the total of embezzled funds the amount of cash withdrawals as indicated by Stephen's bank statements, totaling $38,248.53. Accordingly, Stephen and Jessica received and spent $61,297.27 of embezzled funds.

## 2. Jessica Smith

Jessica Smith, Kimberly's daughter, received $40,085.66 of embezzled funds.[6] Kimberly also helped set up Jessica's bank account when Jessica was in high school. Jessica, like all the other defendants, testified that she never looked at bank statements, never checked her balance, and never accessed her account online. Like Zachary, Jessica claimed that all she knew was that her mother was her source of funds. Unlike Zachary, the Court does not find Jessica's testimony credible.

---

[5] Stephen worked for Mid-South for six months in 2009, and the money legitimately earned during this time was deducted from this figure.

[6] Jessica also worked at Mid-South from time to time filing and cleaning, and the money that she legitimately earned was deducted from this figure.

Although Jessica was basically the same age as Zachary and did not have a regular job, the evidence was clear that she was savvier and more worldly than her brother.  She understood how paychecks worked and how much people reasonably earn because of her relationship with Stephen.  She knew what Stephen made and understood that they could not spend more than he was paid.

Kimberly would also tell Jessica that her paycheck was deposited into Jessica's account and, just like Stephen, Jessica would question her mother on why it occurred on such a regular basis.  Jessica was also aware that Kimberly was arrested and plead guilty to stealing money from Nu-Corp in 2009.  Like Stephen, Jessica knew something was not right, but did not question it further because she was profiting.

Based on the uncontradicted testimony that Kimberly made Jessica withdraw cash and give it to her, the Court has deducted the amount of cash withdrawals as indicated by Jessica's bank statements totaling $2,290.00.  Therefore, Jessica received and spent $37,644.73 of embezzled funds.[7]  In the aggregate, $139,631.46 flowed through Jessica and Stephen's accounts, and they spent $98,942.00.  While their accounts were separate, their testimony was clear that they shared funds and treated their accounts as joint accounts.

---

[7] Jessica identified three charges on her account that she did not incur, totaling $150.93.  This amount has been deducted.

12

Jessica and Stephen testified that they had no idea of Kimberly's scheme or that they were spending embezzled funds. The Court does not find this testimony credible. Even after withdrawing cash for Kimberly, Jessica and Stephen knew that a lot of money was going through their accounts and that they were receiving, and ultimately spending, a large amount of money that they did not earn. This raised their suspicions and they both questioned the source of the money in their accounts. When rebuffed by Kimberly, they did not force the issue because they were more concerned with spending the funds than ensuring their legitimacy.

## III.    <u>CONCLUSIONS OF LAW</u>

Section 523 of Title 11 of the United States Code[8] outlines the exceptions to discharge in bankruptcy proceedings. The creditor bears the burden of proof of establishing by a preponderance of the evidence that the debt in question should be excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Exceptions to discharge are to be narrowly construed in favor of the debtor in order to effectuate the fresh start policy of the Bankruptcy Code. *Miller v. Abrams (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998).

There is no dispute that the Defendants received the funds at issue or that the funds belonged to Mid-South. No one disputes that the Defendants

---

[8] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.

13

should not have received these funds.  None of the money has been repaid to Mid-South.  The respective debts detailed above are owed, and the only question is whether they are nondischargeable.

Mid-South asserts that the respective debts are nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6).  The Court concludes that Mid-South has not carried its burden as to Zachary, but it has carried its burden as to Jessica and Stephen under § 523(a)(2)(A) and (a)(6).

## A. Dischargeability under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).  The United States Supreme Court has distinguished between "false pretenses and representations" and "actual fraud," and recognized two distinct paths for nondischargeability under 523(a)(2)(A). *Husky Intern. Electronics, Inc. v. Ritz*, --- U.S. ---; 136 S. Ct. 1581, 1586 (2016). Satisfaction of the elements of either path is sufficient.

### 1. <u>False Pretenses and Representations</u>

In order for a debt to be nondischargeable based on false pretenses and false representations, the objecting creditor must prove by a preponderance of the evidence that the debtor's representation was: (1) a knowing and fraudulent falsehood[9] (2) describing past or current facts (3) that was relied on by the other party.[10] *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992). The creditor's reliance need not be objectively reasonable, just subjectively justifiable. *Field v. Mans*, 516 U.S. 59, 76 (1995).

The first element requires that the debtor have made a false representation or that his words or actions constituted false pretenses. *Allison*, 960 F.2d at 483. Mid-South did not put on any evidence that the Defendants ever represented anything to Mid-South. In fact, Mid-South's owner testified

---

[9] The United States Supreme Court recently re-confirmed the distinction between false representations and pretenses from actual fraud under §523(a)(2)(A). *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016) ("Congress did not intend 'actual fraud' to mean the same thing as a 'false representation' . . . . "). In *Ritz*, the Supreme Court held that a representation was not necessary for the actual fraud prong. *Id.* A representation or conduct constituting false pretenses is still required for the false pretenses and representations prong. *Tomlinson v. Clem (In re Clem)*, 2017 WL 7050766 at *35-36 (Bankr. N.D. Tex. 2017) (requiring a statement or conduct by the defendant depended on by the plaintiff for the false pretenses and representations prong but not for the actual fraud prong); *Holzhueter v. Groth (In re Holzhueter)*, 575 B.R. 444, 453 (Bankr. W.D. Wis. 2017) (requiring a statement or conduct by the defendant depended on by the plaintiff for the false pretenses and representations prong but not for the actual fraud prong).

[10] In post-trial briefing, Mid-South argued that the Court raised the reliance issue *sua sponte* and implied that they were surprised by the inclusion of reliance as an issue. Reliance is an element of nondischargeability under § 523(a)(2)(A). *Allison*, 960 F.2d 481, 483 (5th Cir. 1992). Therefore, it was raised not *sua sponte*, but by the filing of the complaint.

that the Defendants did not make any false representations.  Further, Mid-South did not put on any evidence of the Defendants' conduct that constituted false pretenses.  The Defendants did not interact directly with Mid-South in a way that could establish a pretense for them to receive the funds.  Thus, the first element is not satisfied, and the debts owed to Mid-South by the Defendants are not excepted from discharge under the false pretenses and representations prong of §523(a)(2)(A).  *See Hiner v. Koukhtiev (In re Koukhtiev)*, 576 B.R. 107, 129 (Bankr. S.D. Tex. 2017) ("Plaintiff has failed to satisfy all three elements required to demonstrate that the Judgment resulted from the Debtor's false representation or false pretenses.  Indeed, the record is devoid of sufficient evidence showing that any false representations were made by the Debtor or that his words or actions constituted false pretenses.").

### 2. Actual Fraud

The Fifth Circuit previously set out the elements for actual fraud nondischargeability, which included the requirement of a representation by the debtor.  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995).  In 2016, the United States Supreme Court concluded otherwise, holding that a representation by the debtor is not required.  *Ritz*, 136 S. Ct. at 1586 ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyances schemes, that can be effected without a false representation.").  In order to establish that a debt is excepted from discharge

16

based on actual fraud, the objecting party must prove: (1) the debtor committed actual fraud; (2) the debtor obtained money, property, services, or credit by the actual fraud; and (3) the debt arises from the actual fraud. *Id.* at 1587-88.

First, the debtor must have committed actual fraud. *Id.* There are two parts to actual fraud: actual and fraud. *Id.* at 1586. For fraud to be "actual," there must be wrongful intent. *Id.* A debtor's subjective intent may be inferred by examining the totality of the circumstances because it most commonly cannot be established by direct evidence. *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287-88 (8th Cir. 1987) (abrogated on other grounds); *Webster City Prod. Credit Ass'n v. Simpson (In re Simpson)*, 29 B.R. 202, 211-12 (Bankr. N.D. Iowa 1983); *Mick v. Hosking (In re Hosking)*, 19 B.R. 891, 895 (Bankr. W.D. Wis. 1982); *Sun Bank and Trust Co. v. Rickey (In re Rickey)*, 8 B.R. 860, 863 (Bankr. M.D. Fla 1981). If a plaintiff provides circumstantial evidence of the debtor's intent, the debtor must offer more than an assertion of honest intent to overcome the implications of the circumstantial evidence. *Van Horne,* 823 at 1287-88. If the debtor offers an unsupported assertion of honest intent, the Court must determine whether the debtor's actions "appear so inconsistent with [their] self-serving statement of intent that the proof leads the court to disbelieve the debtor." *De La Cruz v. Cohen (In re Cohen)*, 185 B.R. 171, 178 (quoting *Van Horne*, 823 F.2d at 1288).

Reckless indifference to the truth is sufficient to satisfy the actual requirement of actual fraud:

> [A]ctual fraud requires knowledge of the falsity and an intent to deceive. A showing of reckless indifference will be sufficient to satisfy the knowledge element. To establish knowledge based on recklessness, the conduct must exceed negligence and rise to the level of reckless disregard for the truth. A court may find recklessness based on a pattern of conduct or behavior.
>
> In addition, reckless indifference to the truth is sufficient to prove the requisite intent to deceive. Thus, a reckless disregard of the truth of a statement will fulfill both the knowledge element and the intent to deceive element.

*In re Cohen*, 185 B.R. at 177-78 (internal citations omitted); *see also Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 30 n. 12 (5th Cir. 1995) (finding that reckless disregard for the truth combined with the sheer magnitude of the resultant misrepresentation may combine to create an inference of intent to deceive under § 523(a)(2)(B)); *see also Farmers & Merchants State Bank v. Perry (In re Perry)*, 448 B.R. 219, 226 (Bankr. N.D. Ohio 2011) ("'[W]illful blindness' does not provide a defense to an action brought under § 523(a)(2)(A), and may instead be used as a factor indicative of fraud."). Therefore, a debtor who recklessly disregards the truth has the requisite wrongful intent for his actions to constitute actual fraud. *Id.*

Fraud, as used in § 523(a)(2)(A), "connotes deception or trickery." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 11 (B.A.P. 10th Cir. 2016) (citing *Ritz*, 136 S.Ct. at 1586). In *Ritz*, the Supreme Court declined to adopt

a definition of fraud because of the multiplicity of situations in which it may

be present. *Ritz*, 136 S. Ct. at 1586-87. The Seventh Circuit Court of Appeals

previously expounded:

> Fraud is a generic term, which embraces all the multifarious means
> which human ingenuity can devise . . . . No definite and invariable rule
> can be laid down as a general proposition defining fraud, and it includes
> all surprise, trick, cunning, dissembling, and any unfair way by which
> another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000).

The Supreme Court has recognized that a person who knowingly receives

fraudulent funds has committed fraud and the debt is nondischargeable. *Ritz*,

136 S.Ct. at 1589 ("But the recipient of the transfer— who, with the requisite

intent, also commits fraud—can obtain assets by his or her participation in the

fraud. If that recipient later files for bankruptcy, any debts traceable to the

fraudulent conveyance will be nondischargeable.") (internal quotations and

citations omitted). *Ritz* concerned a fraudulent conveyance where there was

no representation by the debtor. The Supreme Court held the debt non-

dischargeable. *Ritz*, 136 S. Ct. at 1585. There is nothing in *Ritz* that indicates

that this principle applies only to fraudulent conveyances. One who knowingly

receives embezzled money is practicing the same level of deception as the

recipient of a fraudulent conveyance who knows that he is receiving funds that

he should not.

The second element is that the debtor obtained money, property services, or credit by the actual fraud. *Ritz*, 136 S. Ct. at 1587-88. "The most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any debt' respecting money, property, services, or . . . credit' that the debtor has fraudulently obtained . . . ." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998). "[T]he phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge." *Id.*

The third element requires that the debt arise from the actual fraud. *Cohen*, 523 U.S. at 218. "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Id.* at 218; s*ee also Ritz*, 136 S. Ct. at 1589 ("any debts 'traceable to' the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A).").

### a. Zachary Burk

The debt owed to Mid-South by Zachary is not excepted from discharge under the actual fraud portion of § 523(a)(2)(A) because he lacked the requisite intent. The Court has found that he had no knowledge of his mother's scheme nor was he willfully blind to his mother's embezzlement. Zachary was completely unaware that he was spending embezzled money. He believed that he was spending money that his mother legitimately earned. Zachary had no reason to believe that he was involved in a scheme, and thus had no intent to

20

deceive. *See Friendly Fin. Service-Eastgate Inc. v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007) ("A creditor must prove the debtor's intent to deceive in order to obtain a non-dischargeability judgment under . . . § 523(a)(2)(A)").

Zachary did spend freely, but he had always been able to spend whatever he wanted and his mother would manage his account balance. Most adults would have realized that Zachary was spending more than his mother was making, but he did not. While his actions may have been negligent, they do not amount to the level of willful blindness necessary to establish wrongful intent. Thus, Zachary did not have the intent required to commit actual fraud. Because Zachary did not commit actual fraud, the remaining elements required for a debt to be nondischargeable for actual fraud under § 523(a)(2)(A) cannot be met.

### b. <u>Jessica and Stephen Smith</u>

Jessica and Stephen's debt to Mid-South is nondischargeable under the actual fraud portion of § 523(a)(2)(A). This Court finds and concludes that the they knew of Kimberly's scheme. Their spending money that they knew was embezzled demonstrates their intent to deceive. By knowingly receiving stolen funds and then spending that money, Jessica and Stephen committed actual fraud. At a minimum, they recklessly disregarded the truth. Jessica and Stephen knew of Kimberly's past. They were suspicious of Kimberly's

activities and the money that was being deposited into their accounts, but they did not fully investigate the source of the funds. They chose not to do so in order to ensure that they had no "knowledge" and would be able to continue spending in excess. Therefore, even if they had no actual knowledge, Jessica and Stephen's willful blindness satisfies the intent element. *In re Cohen*, 185 B.R. at 177-78; *Norris*, 70 F.3d at 30 n. 12; *Perry*, 448 B.R. at 226.

Likewise, knowingly receiving and spending stolen funds is a deception that fits squarely in the language courts have used to define fraud. *McClellan*, 217 F.3d at 893. As the Supreme Court found in *Ritz*, knowingly receiving property that belongs to someone else is fraud for the purposes of § 523(a)(2)(A). *Ritz*, 136 S.Ct. at 1589. The first element is met.

Second, Jessica and Stephen obtained $98,942.00 by their actual fraud.[11] There is no dispute that they received the money, and the Court has concluded that they committed actual fraud by knowingly receiving and spending these stolen funds. The second element is met.

---

[11] Jessica and Stephen are jointly and severally liable for this debt because of their common use of the funds. Jessica received and spent $37,644.73 and Stephen received and spent $61,297.27. Jessica and Stephen had separate accounts, but they treated the embezzled funds as a common fund and both spent and benefited from them. *See SEC v. Jantzen*, 2012 WL 13032919 at *12 (W.D. Tex. 2012) ("The imposition of joint and several liability is appropriate because of John and Marleen's close relationship as husband and wife, and their actions in concert with one another.") (citing *See SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) and *Svoboda*, 409 F.Supp.2d 331, 346 (S.D. NY 2006) (ordering joint and several liability where defendant "was to share equally in the proceeds of the fraudulent scheme he enabled").

Third, the debt Jessica and Stephen owe to Mid-South arises from their actual fraud.  They were able to spend the Mid-South funds because of their actual fraud.  Further, since it has been established that Jessica and Stephen obtained the funds by their actual fraud, this element is met.  *Cohen*, 523 U.S. at 214 ("Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge.").

Because Jessica and Stephen committed actual fraud, obtained money by their actual fraud, and the debt arose from their actual fraud, the Defendants, jointly and severally, owe a nondischargeable debt of $98,942.00 to Mid-South under § 523(a)(2)(A).[12]

## B. Dischargeability under 523(a)(4)

Mid-South also asserts that its claims are nondischargeable pursuant to §523(a)(4), which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
> . . . .
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

The phrase "debt for" means "debt arising from" or "debt on account of." *Cohen*, 523 U.S. at 220-21.  There are three separate types of debts rendered

---

[12] The Court's holding that the debt is nondischargeable under § 523(a)(2)(A) is sufficient as to Jessica and Stephen.  Nevertheless, the Court will address the remaining claims as to all Defendants while the record remains fresh.

nondischargeable under §523(a)(4): (1) debts resulting from fraud or defalcation while acting in a fiduciary capacity; (2) debts resulting from embezzlement; and (3) debts resulting from larceny. *Humphries v. Rogers (In re Humphries)*, 516 B.R. 856, 866 (Bankr. N.D. Miss. 2014). Mid-South did not specify under which subpart of § 523(a)(4) that it was traveling, so the Court will address all three.

### 1. Fraud or Defalcation While Acting in a Fiduciary Capacity

Determining whether a debtor committed fraud or defalcation while acting in a fiduciary capacity is a two-step process. *Int'l Beauty Products v. Beveridge (In re Beveridge)*, 416 B.R. 552, 570 (Bankr. N.D. Tex. 2009). First, it must be shown that the requisite fiduciary relationship existed prior to the particular transaction from which the debt arose. *See, e.g., Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 879 (5th Cir. Unit B 1982); *Wright v. Menendez (In re Menendez)*, 107 B.R. 789, 793 (Bankr. S.D. Fla 1989); *Victor v. Valdes (In re Valdes)*, 98 B.R. 78, 80 (Bankr. M.D. Fla. 1989). Second, some type of fraud or defalcation must have occurred during the fiduciary relationship. *In re Chavez*, 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992). Because the Court finds and concludes that no fiduciary relationship existed under §523(a)(4) with regard to these Defendants, the Court never reaches the second step.

24

To determine whether a debtor was acting in a fiduciary capacity under § 523(a)(4), the Court must look to federal law.  *Miller*, 156 F.3d at 602.  For the purposes of § 523(a)(4), the term "fiduciary" is distinct from the concept of a "fiduciary" under common law.  *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998).  Rather, it is limited to instances involving express or technical trusts.  *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir.  2012).  Constructive or *ex maleficio* trusts–those created to combat unjust enrichment–are excluded from the scope of § 523(a)(4).  *Tran*, 151 F.3d at 342.  "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio.  He must have been a trustee before the wrong and without reference thereto."  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934).

Mid-South offered no evidence that the Defendants were in a fiduciary capacity during the embezzlement of Mid-South funds.  There was no evidence of an express or technical trust.  The Defendants were in no position of trust at Mid-South nor were they ever entrusted with any property for Mid-South.  The Defendants did work for Mid-South very briefly, but Dennis Jones testified that they were never in a position of trust.  There was no fiduciary duty owed to Mid-South by the Defendants.

Mid-South argued that under Mississippi law there was a fiduciary relationship between the parties, citing *Cross Point Church v. Andrews*, 560 B.R. 429 (Miss. 1987) and *Lowery v. Guaranty Bank & Trust Co.*, 592 So. 2d 79 (Miss. 1991). This argument fails for several reasons. First, the Fifth Circuit has recognized "the concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law. Under § 523(a)(4), 'fiduciary' is limited to instances involving express or technical trusts." *Tran*, 151 F.3d at 342; *see also Miller*, 156 F.3d at 602. Second, in *Cross Point Church* the debtor "admitted at Trial that as pastor, officer, and Board member, he owed a fiduciary duty. . . ." 501 So. 2d at 445. The Defendants have not admitted any such duty and did not owe one to Mid-South during the embezzlement. Third, the Mississippi Supreme Court stated in *Lowery*, "Mississippi law also recognizes informal fiduciary relationships in a legal, moral, domestic, or personal context, where there appears on the one side an overmastering influence or, on the other, weakness, dependency, or trust, justifiably reposed." 592 So. 2d at 83. Here, the Defendants had no influence over Mid-South. Mid-South was not depending on or trusting them. Mid-South trusted Kimberly, and she had influence over Mid-South, but she is not a debtor or defendant here. The Defendants were not in a fiduciary relationship with Mid-South. Thus, the debt they owe to Mid-South is not excepted from discharge under the first sub-part of § 523(a)(4).

26

## 2. <u>Embezzlement</u>

The United States Supreme Court has defined embezzlement as "the fraudulent appropriation of property by a person to whom such property has been intrusted [sic], or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1895). "There must be proof of the debtor's fraudulent intent in taking the property." *Miller*, 156 F.3d at 603. *Miller* referenced *Brady v. McAllister*, which provided the elements of embezzlement, which are: (1) the creditor entrusted his property to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) circumstances indicate fraud. *Id.* (citing *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996)).

Mid-South's embezzlement claim fails because it cannot meet the first element. Dennis testified that the Defendants were never entrusted with property from Mid-South. They definitely were not entrusted with the money deposited into their accounts and that they spent. Kimberly was entrusted with Mid-South's funds and pleaded guilty to embezzlement, but she is not a defendant in this case. Because the Defendants did not lawfully receive the funds, their debt owed to Mid-South is not excepted from discharge under the second sub-part of § 523(a)(4).

### 3. <u>Larceny</u>

Federal common law defines larceny as a "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Smith v. Williams (In re Smith)*, 253 F.3d 703, 2001 WL 498662 *2 (5th Cir. 2001) (unpublished) (citing *Clarendon National Insurance Co. v. Barrett (In re Barrett)*, 156 B.R. 529, 533 n. 3 (Bankr. N.D. Tex. 1993). Larceny differs from embezzlement in that the original taking of the property in the case of embezzlement was lawful, or with the owner's consent, with larceny, "the felonious intent must have existed at the time of taking." *Moore,* 160 U.S. at 270. To prove larceny, the creditor must prove by a preponderance of the evidence that the debtor feloniously took the creditor's personal property with the intent to convert it or deprive the creditor of it. *Smith*, 253 F.3d at *2.

The facts here are similar to those of *In re Bowie*, in which a debtor's wife stole funds and had them deposited into the couple's joint bank account. 2010 WL 4340209, at *4 (Bankr. D. Conn. Oct. 25, 2010). In *Bowie*, the plaintiffs did not claim that the debtor ever directly took or helped his wife take any money but that he knowingly received and concealed the stolen funds in their joint account. *Id.* at *2. The debtor claimed to have no knowledge of the deposits or the theft. *Id.* The *Bowie* court found that "[n]otwithstanding the Movant's knowledge or intent, the Plaintiffs' claims against him for receiving stolen property do not fall within the federal common law definition

28

of larceny." *Id.* at \*4.  The receipt of stolen property did not constitute larceny

because the debtor did not do the actual taking:

> Unlike the state-law statutory definition, the federal common law
> definition of larceny is limited to the initial taking of property from its
> rightful owner and does not include the subsequent receipt, possession,
> or concealment of such stolen property.  [*Chem. Bank v. Marcou (In re
> Marcou)*, 209 B.R. 287, 293 (Bankr. E.D.N.Y. 1997).]  Historically, it is
> the very absence of the latter offenses from the scope of common law
> larceny that led to the creation of a separate statutory offense therefor.
> *See* 3 Wayne R. LaFave, *Substantive Criminal Law* § 20.2 (2d ed.)
> (briefly chronicling the history and evolution of statutes enacted in
> England and the United States since 1692 to establish receiving stolen
> property, which is outside the scope of common law larceny, as a separate
> statutory offense).

*Id.* at \*4.  The court found that the debt was dischargeable because the debtor

did not do the original taking.  *Id.*

Mid-South argued that Kimberly's actions and intent should be imputed

to the Defendants because they were involved in her scheme.  The Fifth Circuit

has held a debt nondischargeable under § 523(a)(4) when the debtor actively

participated in a scheme to deprive mortgage holders of foreclosure sale

proceeds.  *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344

(5th Cir. 2017).  In *Cowin*, the debtor's personal conduct and intent in

participating in the conspiracy were sufficient to satisfy the common law

definition of larceny.   *Id.* at 350 (debtor prepared the deeds of trusts,

intentionally omitted language in order to divert the funds, and instructed the

trustee to foreclose when he knew that the property was encumbered).

29

None of the Defendants here were active participants in Kimberly's scheme, and so her intent cannot be imputed to them.  Zachary did not know or have reason to know of Kimberly's scheme.  Thus, he was not an active participant.  While this Court has found that Jessica and Stephen knew of Kimberly's scheme, it has not found them to be active participants.  They did not directly steal money from Mid-South nor did they aid Kimberly in doing so.  Therefore, Kimberly's intent cannot be imputed to Zachary, Jessica, or Stephen.

The Defendants wrongfully possessed the funds of Mid-South, but they did not do the original taking.  Kimberly took the money from Mid-South.  The Defendants' later possession of the money does not amount to larceny.  Thus, the debt owed by the Defendants to Mid-South is not excepted from discharge under the larceny sub-part of § 523(a)(4).

Because Mid-South has failed to prove a fiduciary relationship, embezzlement, or larceny, Mid-South has failed to carry its burden in establishing that the Defendants' debt to Mid-South is nondischargeable under § 523(a)(4).

## C. <u>Dischargeability under 523(a)(6)</u>

Mid-South also asserts that the debt is nondischargeable under 11 U.S.C. § 523(a)(6), which provides in relevant part:

30

>    (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
>        title does not discharge an individual debtor from any debt—
>
> . . . .
>        (6) for willful and malicious injury by the debtor to another entity or to
>        the property of another entity.

11 U.S.C. § 523(a)(6).

This subsection excepts from discharge debts for a willful and malicious injury by the debtor to another entity or to the property of another entity. *Id.* The United States Supreme Court has held that a willful injury, in this context, is a "deliberate or intentional *injury*, not merely a deliberate *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). In interpreting *Kawaauhau*, the Fifth Circuit has held that an injury is "'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller*, 156 F.3d at 606; *Williams v. Int'l Brotherhood of Electrical Workers Local 520 (In re Williams)*, 337 F.3d 504, 508-09 (5th Cir. 2003).

A debtor's subjective motive to cause harm is a question of fact. *Kungys v. United States*, 485 U.S. 759 (1988) (identifying "subjective intent" as a "questions of fact" that "must be resolved by the trier of fact"); *Pullman-Standard v. Swint*, 456 U.S. 273 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace."); *Sears, Roebuck & Co. v. Boydston (In re Boydston)*, 520 F.2d 1098 (5th Cir. 1975) (applying the clearly erroneous standard to a bankruptcy court's determination of subjective intent).

31

An objective substantial certainty of harm "requires an assessment of all of the relevant facts and circumstances. One fact that often proves determinative in applying the objective test under § 523(a)(6) is the debtor's knowledge at the time of the injury-producing act." *Nev. Prop. 1 LLC v. D'Amico (In re D'Amico)*, 509 B.R. 550, 558 (S.D. Tex. 2014); *see e.g., Williams*, 337 F.3d 504 ; *Texas v. Walker*, 142 F.3d 813, 815 (5th Cir. 1998). Substantial certainty does not mean absolute certainty— "[o]therwise, no acts would meet the formulation because no act will definitely produce harm—all effects are probab[i]listic." *Conte v. Gautam (In re Conte)*, 33 F.3d 303, 308 n. 2 (3d Cir. 1994) (*cited in Corley v. Delany (In re Delany)*, 97 F.3d 800, 802 n. 7 (5th Cir. 1996). But it requires more than a "high probability of harm." *Id.* at 307. Mere recklessness is insufficient under § 523(a)(6). *Id.*; *Miller*, 156 F.3d at 603 (noting that "[t]he Supreme Court's disposition in *Kawaauhau* certainly eliminates the possibility that 'willful' encompasses negligence or recklessness").

### 1. <u>Zachary Burk</u>

The Court has found that Zachary did not know or have reason to know of his mother's scheme. Because he did not know that he was spending embezzled funds, he did not have the subjective intent to cause Mid-South harm. *Herbert v. Davies (In re Davies)*, 494 B.R. 453, 464 (Bankr. C.D. Cal. 2013) ("Receipt and use of converted funds has been held to satisfy the

requirements of 'willful and malicious injury,' only if the recipient had knowledge of the converted nature of funds."); *Bryant v. Lynch (In re Tilly)*, 286 B.R. 782 (Bankr. D. Colo. 2002) (use of converted funds not "willful and malicious" if no evidence of knowledge of converted nature of funds); *Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883 at 6-7 (B.A.P. 10th Cir. 2011) (same).

Further, because he did not have reason to know that he was spending embezzled funds, there was not an objective certainty that harm would result from his actions. Zachary was wholly dependent on his mother and believed that he was spending funds that she legitimately earned. Although he was mistaken, his mistaken belief does not give him the requisite intent under § 523(a)(6). *Miller*, 156 F.3d at 606 ("Eliminating the 'just cause or excuse' exception would not ensnare those who have acted under 'an honest, but mistaken belief.' Such individual cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of 'not substantially certain to result,' in the absence of the fact about which there has been mistake."). Mid-South has not carried its burden of proving that the debt Zachary owes is the result of a willful and malicious injury to Mid-South.

## 2. Jessica and Stephen Smith

Although Jessica and Stephen told basically the same story as Zachary, the outcomes differ because, unlike Zachary, the Court did not find their

testimony credible. By knowingly spending funds embezzled from Mid-South, the Defendants had a subjective intent to cause harm to Mid-South. *Haemonetics Corp. v. Dupre*, 238 B.R. 224, 230 (D. Mass. 1999) (debt held to be nondischargeable because wife knew excess funds in joint checking account were stolen but wrote checks on the funds).

Even if Jessica and Stephen did not have actual knowledge but were instead willfully blind to the nature of the funds in their accounts, the debt is still nondischargeable under § 523(a)(6), because there was an objective substantial certainty that they were causing harm. Jessica and Stephen knew Kimberly had embezzled from her employers, what Kimberly could reasonably be earning at work, that Kimberly was spending far beyond that, and that she was enabling them to also spend far beyond their means. Additionally, Jessica and Stephen were suspicious of the money Kimberly put into each of their accounts. They questioned Kimberly about why her paycheck was being deposited into their accounts but dropped the issue when Kimberly became angry when asked about it. A reasonable person in this situation, knowing what Jessica and Stephen did, would be acting with substantial certainty that they were spending ill-gotten gains. Jessica and Stephen's decision to be willfully blind to the scheme shows that they continued to spend the money with a substantial certainty that they were causing harm, because they knew that if they discovered the true source of the funds, they would not be able to

spend in excess.   There was an objective substantial certainty, in these circumstances, that turning a blind eye and continuing to spend in excess would cause a substantial harm to the rightful owner of the funds. Accordingly, their debt to Mid-South is also nondischargeable under § 523(a)(6).

## IV.   <u>CONCLUSION</u>

Mid-South has not satisfied the elements of § 523(a)(2)(A), (a)(4), or (a)(6) as to Zachary.  A separate final judgment in favor of Zachary Alan Burk will be entered.

Mid-South has satisfied the elements of § 523(a)(2)(A) and (a)(6) against Jessica and Stephen Smith.  A separate nondischargeable final judgment will be entered against them, jointly and severally, in the amount of $98,942.00.

##END OF ORDER##